# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 6502 | **DATE** | JAN. 11 , 2001 |
| **CASE TITLE** | UNITED STATES ex rel. ANIL K. BIDANI, M.D. v. EDMUND J. LEWIS, et al. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Anil Bidani's motion for summary judgment is denied. Defendants' motion for summary judgment [91-1] is granted. The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiff (a) dismissing with prejudice plaintiff's claims based on the common ownership of American Medical Supply Company and Circle Medical Management, Inc. and (b) dismissing all other aspects of plaintiff's cause of action without prejudice for lack of subject matter jurisdiction.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 4 | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JAN 1 2 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | 115 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 01/11/2001 | |
| CW | courtroom deputy's initials | date mailed notice | |
| | | date/time received in central Clerk's Office | mqm mailing initials | |

FILED FOR DOCKETING
01 JAN 11 PM 5: 50

UNITED STATES OF AMERICA ex rel.          )
ANIL K. BIDANI, M.D.,                     )
                                          )
                    Plaintiff,            )
                                          )
          v.                              )        No. 97 C 6502
                                          )
EDMUND J. LEWIS, AMERICAN                 )
MEDICAL SUPPLY CORPORATION, and           )
CIRCLE MEDICAL MANAGEMENT                 )
CORPORATION,                              )
                                          )
                    Defendants.           )

**DOCKETED**
JAN 1 2 2000

## MEMORANDUM OPINION AND ORDER

A <u>qui tam</u> action pursuant to the False Claims Act
("FCA"), was initiated by the relator, Anil Bidani, M.D., a
former employee of an entity controlled by defendant Edmund
Lewis, M.D.  The other two defendants are entities owned and
controlled by Lewis, American Medical Supply Corporation ("AMS")
and Circle Medical Management Corporation ("CMM").  Lewis was the
Chief of Nephrology at Rush-Presbyterian-St. Luke's Medical
Center ("Rush") in Chicago, Illinois.  Bidani claims that
defendants obtained excessive Medicare reimbursements for kidney
dialysis supplies.  Following this court's rulings on defendants'
motion to dismiss, two claims remain pending.  <u>See</u> <u>United States</u>

ex rel. Bidani v. Lewis, No. 97 C 6502 (N.D. Ill. Dec. 29, 1998)
(Docket Entry 25) ("Bidani I"), reconsideration granted in part,
1999 WL 163053 (N.D. Ill. March 12, 1999) ("Bidani II"). One
remaining claim is that Lewis was receiving an illegal kickback
by referring dialysis patients to a company he owned (AMS) for
dialysis supplies (the "kickback claim"). See Bidani I, at
12-13. The other remaining claim is based on AMS representing it
was a dialysis supplier even though it did not qualify as a
dialysis supplier because of Lewis's common ownership of both AMS
and CMM, a dialysis facility (the "supplier claim"). See
Bidani II, 1999 WL 163053 at *1-3. As to both of these claims,
the applicable statute of limitations limits Lewis's claims to
damages accruing September 15, 1991 or later. See id. at *3-9.
See also United States ex rel. Downy v. Corning, Inc., 118 F.
Supp. 2d 1160, 1168-70 (D.N.M. 2000) (following Bidani II).
Presently pending are both sides' motions for summary judgment.

On a motion for summary judgment, the entire record is
considered with all reasonable inferences drawn in favor of the
nonmovant and all factual disputes resolved in favor of the
nonmovant. Schneiker v. Fortis Insurance Co., 200 F.3d 1055,
1057 (7th Cir. 2000); Baron v. City of Highland Park, 195 F.3d
333, 337-38 (7th Cir. 1999). The burden of establishing a lack
of any genuine issue of material fact rests on the movant.

<u>Wollin v. Gondert</u>, 192 F.3d 616, 621-22 (7th Cir. 1999); <u>Essex v.</u>
<u>United Parcel Service, Inc.</u>, 111 F.3d 1304, 1308 (7th Cir. 1997).
The nonmovant, however, must make a showing sufficient to
establish any essential element for which it will bear the burden
of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322
(1986); <u>Shank v. William R. Hague, Inc.</u>, 192 F.3d 675, 681 (7th
Cir. 1999); <u>Wintz v. Northrop Corp.</u>, 110 F.3d 508, 512 (7th Cir.
1997). The movant need not provide affidavits or deposition
testimony showing the nonexistence of such essential elements.
<u>Celotex</u>, 477 U.S. at 324. Also, it is not sufficient to show
evidence of purportedly disputed facts if those facts are not
plausible in light of the entire record. <u>See</u> <u>NLFC, Inc. v.</u>
<u>Devcom Mid-America, Inc.</u>, 45 F.3d 231, 236 (7th Cir.), <u>cert.</u>
<u>denied</u>, 515 U.S. 1104 (1995); <u>Covalt v. Carey Canada, Inc.</u>, 950
F.2d 481, 485 (7th Cir. 1991); <u>Collins v. Associated</u>
<u>Pathologists, Ltd.</u>, 844 F.2d 473, 476-77 (7th Cir.), <u>cert.</u>
<u>denied</u>, 488 U.S. 852 (1988). As the Seventh Circuit has
summarized:

> The moving party bears the initial burden of
> directing the district court to the determinative
> issues and the available evidence that pertains
> to each. "[A] party seeking summary judgment
> always bears the initial responsibility of
> informing the district court of the basis for
> its motion, and identifying those portions
> of 'the pleadings, depositions, answers to
> interrogatories, and admissions on file, together
> with the affidavits, if any' which it believes
> demonstrate the absence of a genuine issue of
> material fact." <u>Celotex Corp. v. Catrett</u>, 477

317, 323 (1986); id. at 325 ("the burden on the
moving party may be discharged by 'showing'--that
is, pointing out to the district court--that there
is an absence of evidence to support the nonmoving
party's case"). Then, with respect to issues that
the non-moving party will bear the burden of
proving at trial, the non-moving party must come
forward with affidavits, depositions, answers to
interrogatories or admissions and designate
specific facts which establish that there is a
genuine issue for trial. Id. at 324. The
non-moving party cannot rest on the pleadings
alone, but must designate specific facts in
affidavits, depositions, answers to interroga-
tories or admissions that establish that there
is a genuine triable issue. Id. The non-moving
party "must do more than simply show that there is
some metaphysical doubt as to the material facts."
Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 586 (1986). "The mere existence of a
scintilla of evidence in support of the [non-moving
party's] position will be insufficient; there must
be evidence on which the jury could reasonably find
for the [non-moving party]." Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 252 (1986).

Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992).

Defendants' motion will be considered first. On

defendants' motion, all reasonable inferences are drawn in

relator's favor and all genuine factual disputes are resolved in

relator's favor. Defendants argue five different grounds that

they contend entitle them to summary judgment. They contend

(a) relator cannot establish any essential element of his FCA

claims; (b) relator's claims fail because AMS was not established

for the purpose of evading reimbursement limits; (c) relator

cannot establish the elements of a criminal violation of the

pertinent anti-kickback statute; (d) relator was not an "original source" as that term is used in the FCA; and (e) relator cannot show any injury to the government. Because being an original source is a jurisdictional requirement, <u>United States v. Bank of Farmington</u>, 166 F.3d 853, 859 (7th Cir. 1999); <u>Bidani I</u>, at 6, that issue will be considered first.

The FCA prohibits a relator from bringing an FCA claim based on information that was previously publicly disclosed unless the relator is an "original source" of the information. 31 U.S.C. § 3730(e)(4)(A). As to all of the claims in relator's complaint, all the essential facts[1] were publicly disclosed prior to the filing of the <u>qui tam</u> action. <u>See</u> <u>Bidani I</u>, at 9-10. An "original source" is defined as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). In <u>Bidani I</u>, it was held that Bidani could not be an original source of information he obtained through discovery in a state court

---

[1]In <u>Bidani I</u>, it was unnecessary to resolve the circuit split regarding whether all essential facts have to be publicly disclosed for the original source rule to be applicable. <u>See</u> <u>id.</u> at 8 & n.2. Subsequently, the Seventh Circuit held that the original source rule applies as long as any part of the essential facts has been publicly disclosed. <u>Farmington</u>, 166 F.3d at 863-64.

lawsuit he brought against these same defendants. Id. at 11.[2]
The only pertinent information for which Bidani was an original
source was Lewis's ownership of AMS. See id. at 12. In
Bidani I, it was held that "[t]he relator is not required to have
information as to all the elements of the unlawful conduct; it is
sufficient to have information as to at least one essential
element of the unlawful conduct." Id. at 12 (citing United
States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d
675, 690 (D.C. Cir.), cert. denied, 522 U.S. 865 (1997); United
States ex rel. Springfield Terminal Ry. v. Quinn, 14 F.3d 645,
657 (D.C. Cir. 1994); United States ex rel. Lamers v. City of
Green Bay, 998 F. Supp. 971, 982 (E.D. Wis. 1998) ("Lamers I"),

---

[2]In an unclear discussion, see Bidani Memo. in Opposition
to Sum. Jmt. 12-13, relator contends that Farmington, 166 F.3d
at 859-60, overruled Bidani I's holding that disclosures in court
proceedings are public disclosures (id. at 8) and/or the holding
that information obtained in court discovery is not original
source material (id. at 11). However, consistent with Bidani I,
at 11, the Seventh Circuit followed the line of authority holding
that disclosures in discovery do not constitute public disclosure
unless the discovered material is included in a public pleading.
Farmington, 166 F.3d at 860. Thus, for purposes of determining
whether information had been publicly disclosed, Bidani I looked
to the public pleadings in the related state court action. See
Bidani I, at 8-9. Bidani I correctly holds that all essential
facts were publicly disclosed. Contrary to relator's other
contention, the line of authority that information obtained in
court discovery is not original source material does not rely on
what is considered to be public disclosure, but on the fact that
the discovery process is not independent (as required to be an
original source) because it involves court intervention. See
Bidani I, at 11. These holdings in Bidani I were not overruled
by Farmington.

<u>aff'd</u>, 168 F.3d 1013 (1999) ("<u>Lamers II</u>")[3]).  It was held that Lewis's ownership of AMS was an essential element of both the kickback claim, <u>Bidani I</u>, at 13, and the supplier claim, <u>Bidani II</u>, 1999 WL 163053 at *3 & n.4.  Therefore, Bidani could be considered an original source of information that had been publicly disclosed.

As regards the present motion, neither side disputes the <u>Bidani I</u> conclusion that Bidani was an original source of the information that Lewis owned AMS.  Citing <u>Farmington</u>, 166 F.3d at 863-64, defendants contend that Seventh Circuit case law now establishes that a relator must be the original source of all publicly disclosed information that is essential to the <u>qui tam</u> action.  A key problem with defendants' argument is that <u>Farmington</u> contains no such holding.  If anything, though, <u>Farmington</u> is contrary to defendants' assertion.  The relator in <u>Farmington</u> argued that, even if she had no independent knowledge of the basic underlying facts, it was she that put the publicly disclosed facts together to discover an otherwise hidden pattern. In <u>dictum</u>, the Seventh Circuit stated:  "In an exceptionally or unusually complicated allegation of fraud each piece of the information may be publicly disclosed, yet the fraud itself may remain hidden until some perspicacious plaintiff puts it in perspective.  We acknowledge that in such a case, a plaintiff

---

[3]<u>Lamers II</u> was issued subsequently to <u>Bidani I</u>.

might be an original source even though her knowledge of every isolated element of the fraud is based upon public disclosure." *Farmington*, 166 F.3d at 864. This *dictum* indicates that a relator may be an original source even though she was not an original source of all essential, publicly disclosed information. Moreover, two months after *Farmington*, the Seventh Circuit affirmed one of the district court opinions relied upon in *Bidani I*. *See Lamers II*, 168 F.3d at 1017-18 (affirming *Lamers I*, 998 F. Supp. at 982-84). *Lamers I*, 998 F. Supp. at 982, expressly states that original sources "need not have direct knowledge of <u>all</u> of the vital ingredients in a fraudulent transaction." It further notes that an essential element of most FCA claims will be a false communication to the government and relators generally will not have direct and independent knowledge of that information, as was true of Lamers. *See id.* While the Seventh Circuit does not <u>expressly</u> refer to an original source needing to have direct and independent knowledge of all essential elements or one element, it does expressly note that Lamers was not the original source of the allegedly false statements submitted directly to the pertinent federal agency, *Lamers II*, 168 F.3d at 1017, and still goes on to hold that Lamers qualified as an original source. *Id.* at 1017-18. The holding in *Bidani I* that Bidani need only show that he was an original source of

information going to at least one essential element of each claim was not overruled by subsequent Seventh Circuit precedents.

Defendants also contend that Bidani cannot be an original source because he failed to provide the information to the government prior to filing the present lawsuit. See 31 U.S.C. § 3730(e)(4)(B); Farmington, 166 F.3d at 865-66; Bidani I, at 13-14.[4] Relator, however, points to evidence that, in September 1995, he provided the pertinent information to the General Counsel of Health and Human Services ("HHS"); the Assistant

---

[4]In their brief, defendants misquote Bidani I as holding "that the disclosure requirement of § 3730(e)(4)(B) 'requires disclosure [to the Government] after the complaint is filed, not before . . . .'" Def. Sum. Jmt. Br. at 26 (quoting Bidani I, at 14) (emphasis added). The quoted passage from Bidani I, however, is describing the requirement of § 3730(b) and expressly states that the § 3730(b) disclosure requirement is different from the disclosure requirement of § 3730(e)(4)(B). See Bidani I, at 14. Bidani I, at 13-15, did reject defendants' contention (based on Sixth Circuit and D.C. Circuit opinions) that the disclosure to the government had to be prior to the public disclosure occurring. While Farmington parenthetically quotes the Sixth Circuit holding to this effect, see Farmington, 166 F.3d at 865 (quoting United States ex rel. McKenzie v. BellSouth Telecommunications, Inc., 123 F.3d 935, 942 (6th Cir. 1997), cert. denied, 522 U.S. 1077 (1998)), the discussion in Farmington is otherwise entirely in terms of disclosing the information to the government before filing suit (as the statute's plain language provides), not disclosing to the government before public disclosure occurs. At most, Farmington indicates disclosure to the government should occur before the government otherwise learns the information. Even if that is the rule, there is no evidence that, prior to Bidani contacting the government, the government had already become aware of any of the pertinent information publicly disclosed in the state court lawsuit. In any event, defendants do not appear to be presently raising this issue. But, to the extent they do, this court would again reach the same holding as in Bidani I, at 13-15.

Director of the United States General Accounting Office (Pl. Exh. N6); the HHS Regional Inspector General for Investigations in Chicago, Illinois (Pl. Exh. N7); and the United States Attorney in Peoria, Illinois (Pl. Exh. N8).[5]  In August 1995, letters were sent to HHS's Office of Inspector General in Washington, D.C. (Pl. Exh. N10); Senator William Cohen (Pl. Exh. N9); Senator William Bradley (Pl. Exh. N11); and the Director of Health Financing and Policy Issues (Pl. Exh. N13).  These letters refer to a Medicare scheme involving a shell corporation, but do not specifically mention any of the present defendants.[6]  The September 1995 letters satisfy the source requirement of giving pre-filing notice to the government.  See Farmington, 166 F.3d at 866.  The two claims that previously survived the motion to dismiss are not now subject to dismissal for failure to satisfy original source requirements.

Before turning to the summary judgment motions, a procedural issue must be addressed.  Following the rulings on

---

[5]Although not cited in relator's statement of facts, he also provides a copy of an August 11, 1995 letter addressed to a woman in the "Dmerc Fraud and Abuse Unit."  Pl. Exh. N14.  Also, Bidani testified that he sent the information to Vice President Gore.  He does not provide a copy of that letter, but does provide a letter from HHS indicating it had been forwarded to HHS.  See Pl. Exh. N5.

[6]The letter to the Inspector General is notated as having an enclosure, but the enclosure is not described.  A letter received in response (Pl. Exh. N12), though, specifically refers to Lewis and AMS.

defendants' motion to dismiss, two claims remained pending. However, in relator's response to summary judgment and in his own summary judgment motion, relator relies on additional claims. While amendment of a complaint is generally possible at any stage of the litigation and is to be freely given if justice so requires, Fed. R. Civ. P. 15(a),[7] other procedural rules also come into play in the present case. Since FCA claims are fraud claims, any additional claims must first be added to the complaint and pleaded with adequate specificity as required by Fed. R. Civ. P. 9(b). <u>Bidani I</u>, at 25. More importantly, relator must be the original source of any additional claims that are based on publicly disclosed information. This includes bringing the claims to the attention of the government prior to filing the present lawsuit. Also, as to any additional claims, relator must have satisfied the government notice requirement of § 3730(b).

One of the additional claims is the claim that AMS received supplies at a discount, but was reimbursed by Medicare at the retail price. Relator contends the discount should have been disclosed to the government, but was not, and that the discount actually represented a kickback to Lewis for using these suppliers. This claim is contained in the complaint, <u>see</u>

---

[7]There is no contention that an amendment at this time would prejudice defendants because of a lack of discovery as to the facts underlying the additional claims.

Complaint ¶¶ 42-48, and was previously dismissed on the ground that it is based on publicly disclosed information and the only information for which Bidani is an original source (Lewis's ownership of AMS) is not an essential element of the claim.  <u>See</u> <u>Bidani I</u>, at 12-13 & n.3.  Although relator presently places a greater emphasis on the discount being a kickback to Lewis, Lewis's ownership of AMS is not essential to this claim.  To the extent the discounts represent a kickback, they are a kickback to AMS and are illegal regardless of Lewis being the owner who benefits from AMS's profits.  Relator will not be permitted to presently pursue the discount/kickback claim since he is not an original source of any of the information on which this claim is based, all of which was previously publicly disclosed.  <u>See</u> <u>id.</u> at 9.

In his own summary judgment motion, relator raises contentions (1) that AMS was ineligible for Medicare payments because it failed to obtain assignments of benefits from patients, Bidani Memo. in Support of Sum. Jmt. 15, and (2) that Lewis, through both AMS and CMM, received kickbacks from Spectra Labs in the form of free lab tests, <u>id.</u> at 21.  The complaint contains no allegations regarding assignments of benefits or Spectra Labs.  Therefore, Rule 9(b) is not satisfied regarding these allegations.  But even if that deficiency were to be corrected, there is no indication that relator brought these

allegations to the government's attention when providing it with the notice required by § 3730(b). Also, these claims apparently rely at least in part on publicly disclosed information, which is all that is required to invoke the original source requirement. See Farmington, 166 F.3d at 863-64. Since Lewis's ownership of AMS would not be an essential element of additional claims based on these allegations, Bidani would not be an original source of any of the information underlying these claims. Also, there is no evidence that, prior to filing suit, Bidani disclosed to the government information about assignments or Spectra Labs, see generally Pl. Exh. N4-14, which is another basis for Bidani not qualifying as an original source of the information. Farmington, 166 F.3d at 865-66. Therefore, this court lacks jurisdiction over these additional claims. The additional claims will not be considered in ruling on the motions for summary judgment.

It is undisputed that AMS and CMM were wholly owned by Lewis. CMM was a dialysis facility that provided outpatient home dialysis services commonly referred to as "Method I." Under the program known as "Method II," the dialysis patient contracts with a dialysis supplier to provide necessary dialysis equipment and related supplies for self-administered home dialysis. AMS purported to be a dialysis supplier providing equipment and supplies under Method II. Lewis and CMM referred Method I patients to AMS for participation in the Method II program. The

government intended that Method II would result in lower costs for dialysis treatment, and thus lower costs for Medicare. However, during times pertinent to the remaining claims, a dialysis supplier could charge more for equipment and supplies under Method II, than a dialysis facility could under Method I. Defendants do not dispute that the continued use of AMS as a dialysis supplier was intended to take advantage of this opportunity for greater profits.[8]

As to the kickback claim, <u>Bidani I</u>, at 22-24, holds that relator sufficiently alleged an FCA violation based on the anti-kickback provision of 42 U.S.C. § 1320a-7b(b), which, during the pertinent time period, provided:

> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under subchapter XVIII of this chapter or a State health care program, or
>> (B) in return for purchasing, leasing, ordering, or arranging or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under subchapter XVIII of this chapter or a State health care program,

---

[8]Defendants state that this was not AMS's original purpose because it was established in 1982, before Method II was in existence.

>               shall be guilty of a felony . . . .
>                    (2) whoever knowingly and willfully offers
>               or pays any remuneration (including any kickback,
>               bribe, or rebate) directly or indirectly, overtly
>               or covertly, in cash or in kind to any person to
>               induce such person—
>                         (A) to refer an individual to a person
>                    for the furnishing of any item or service
>                    for which payment may be made in whole or in
>                    part under subchapter XVIII of this chapter
>                    or a State health care program, or
>                         (B) to purchase, lease, order, or
>                    arrange for or recommend purchasing,
>                    leasing, or ordering any good, facility,
>                    service, or item for which payment may be
>                    made in whole or in part under subchapter
>                    XVIII of this chapter or a State health care
>                    program,
>               shall be guilty of a felony . . . .

That holding was based in part on, accepting as true, relator's allegation that compliance with all applicable statutes, rules, and regulations was implicitly stated in each claim for reimbursement and the further allegation that had the government known the alleged situation, it would have denied reimbursement in the amounts claimed. See Bidani I, at 23. On summary judgment, defendants dispute this latter allegation and also contend the kickback claim fails on additional grounds.

As to the supplier claim, statutes and regulations prohibited a dialysis facility from qualifying as a Method II dialysis supplier. See Bidani II, 1999 WL 163053 at *1 (citing 42 U.S.C. § 1395rr(b)(1)(b); 42 C.F.R. §§ 414.330(a)(2)(i), 400.202). Bidani II, 1999 WL 163053 at *4, applying federal common law, holds that this prohibition also applies to a

purported dialysis supplier that functions out of the same office as a dialysis facility, uses the same employees, and is wholly owned by the same person who wholly owns the dialysis facility.

The FCA provides that a person is liable who "(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government." 31 U.S.C. § 3729(a)(1)-(2). The elements of a claim under these subsections are: (1) the defendant made or presented a record, statement, or claim in order to induce the government to pay money; (2) the record, statement, or claim was false or fraudulent; and (3) the defendant knew it was false or fraudulent. See Lamers II, 168 F.3d at 1018; Shaw v. AAA Engineering & Drafting, Inc., 213 F.3d 519, 531-32 (10th Cir. 2000). A fourth element of the FCA claims in the present case is materiality. See Lamers II, 168 F.3d at 1019; Luckey v. Baxter Healthcare Corp., 183 F.3d 730, 732 (7th Cir.), cert. denied, 528 U.S. 1038 (1999); United States v. Job Resources for Disabled, 2000 WL 1222205 *1-3 (N.D. Ill. Aug. 24, 2000). Defendants contend relator cannot prove the second, third, and fourth elements. The third element will be considered first. For purposes of considering that element, it can be assumed that

Lewis being an owner of AMS and CMM meant he could not legally refer patients to AMS and that AMS could not be a dialysis supplier.

The FCA provides that "knowingly," as used in § 3729, means

> that a person, with respect to information—
> (1) has actual knowledge of the information;
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
> (3) acts in reckless disregard of the truth or falsity of the information,
> and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b). Defendants contend they lacked knowledge of the false nature of their reimbursement claims because they were advised by their attorneys that they were in compliance with the applicable laws and regulations.[9]

Relator does not dispute that advice of counsel can be a defense to an FCA claim. The general elements of an advice of counsel defense are that the defendant "(1) before taking action, (2) he in good faith sought the advice of an attorney whom he considered competent, (3) for the purpose of securing advice on the lawfulness of his possible future conduct, (4) and made a

_____

[9]As to the kickback claim, defendants contend § 1320a-7b(b) itself has a specific intent requirement and therefore an FCA claim based on a § 1320a-7b(b) violation also requires a showing of specific intent to commit the § 1320a-7b(b) violation. Resolution of the knowledge element does not require resolving this specific intent issue.

full and accurate report to his attorney of all material facts which the defendant knew, (5) and acted strictly in accordance with the advice of his attorney who had been given a full report." United States v. Cheek, 3 F.3d 1057, 1061 (7th Cir. 1993), cert. denied, 510 U.S. 1112 (1994) (quoting Liss v. United States, 915 F.2d 287, 291 (7th Cir. 1990)). While contending that Lewis did not make a full disclosure to his attorneys, relator's primary contention is that the attorneys advised him that discounts from suppliers had to be disclosed, but the discounts were not disclosed to the government. The claim based on the discounts, however, has been dismissed. Failure to disclose the discounts is not an element of the remaining claims. The question on the remaining claims is whether, based on the advice of his attorneys, Lewis had an actual, good faith belief that, despite his ownership of AMS and CMM, AMS properly qualified as a supplier and it was proper to transfer or refer patients to AMS for Method II reimbursements. If so, he did not knowingly submit any false claims for reimbursement. The evidence regarding advice of counsel and Lewis's knowledge[10] must be examined in light of this question.

When AMS was incorporated in 1982, attorneys from the law firm of Ross & Hardies advised Lewis on the incorporation,

---

[10]There is no dispute that Lewis's knowledge is also attributable to the two corporate defendants.

including compliance with Medicare regulations. The attorneys
were aware that Lewis would be referring patients he treated at
Rush to AMS. The attorneys considered the Medicare regulations
and did not advise Lewis that it would be improper to refer
patients (for whom AMS would receive Medicare reimbursements) to
a corporation Lewis owned. In 1986, Lewis formed CMM. In early
1988, CMM acquired Rush's dialysis facility. Lewis and CMM
continued to refer patients to AMS for Method II home dialysis.
The Ross & Hardies attorneys provided legal assistance
incorporating CMM and also advised all defendants regarding
compliance with Medicare regulations. In 1988, the attorneys
provided no advice or opinion indicating that Lewis's ownership
of CMM and AMS resulted in a violation of Medicare regulations or
any related rules.

By early 1988, the Health Care Financing Administration
("HCFA") was aware that Method II dialysis suppliers were
charging significantly more for home dialysis supplies than the
composite rate paid to Method I dialysis facilities. In February
1988, the HCFA issued an instruction requesting insurance
carriers to modify the reimbursement of supplies under Method II.
The instruction generally sought to tie Method II reimbursement
rates to the composite rate used by Method I facilities.[11] On

------

[11]The instruction makes no mention of it being improper
for commonly owned entities to make referrals. However, that
issue does not appear to have been a subject of the instruction.

March 31, 1988, Ross & Hardies sent Lewis a copy of the instruction and a memorandum briefly summarizing some aspects of the instruction, particularly the reimbursement rates. The attorneys conclude that the instruction was subject to challenge, but that did not mean anyone would challenge it. They informed Lewis that they could assist him if any carrier requested Lewis's comments. The attorneys made no suggestion that the arrangement of AMS and CMM was illegal, but that was not apparently an issue that the attorneys considered in writing the memorandum.

In December 1988, the HHS Office of Inspector General ("OIG") issued an audit report regarding Method II dialysis suppliers. The report states in part:

> Our review showed that Medicare allowed excessive payments for CAPD supplies. Supply companies which billed Medicare for sales of CAPD supplies to beneficiaries significantly marked up the cost of the supplies. Most of the suppliers reviewed were related to dialysis clinics which had prescribed the CAPD supplies. The suppliers were in substance billing conduits for the clinics. By creating supply companies, the clinics were able to circumvent Medicare reimbursement limitations and thereby profit on the supplies.

> Also, the two manufacturers of CAPD supplies which billed Medicare for direct sales to beneficiaries engaged in price discrimination. They charged Medicare significantly more than what they charged others for the same products.

> The Health Care Financing Administration (HCFA) has recently taken some action on these problems. It instructed carriers to consider inherent

---

Only the reimbursement rate is addressed.

reasonableness in paying claims.  However, more
needs to be done to assure that excessive
payments are not made.  We are recommending that
the HCFA direct the carriers to lower Medicare
allowances for CAPD supplies to the discounted
prices paid by dialysis clinics and suppliers.

Dec. 16, 1988 OIG Memo. at 1 (Def. Exh. F).

The report concludes and recommends:

Medicare regulations provide that carriers may
limit allowances if charges by providers are
"grossly excessive."  Charges may be considered
"grossly excessive" when, among other things,
Medicare is primary payor and the charges are
grossly in excess of acquisition costs.

Our review has shown that providers' charges for
CAPD supplies are, by Medicare regulatory
definition, "grossly excessive."  Medicare is
primary payor:  93 percent of ESRD patients
qualify for Medicare coverage.  Also, providers'
charges are grossly in excess of acquisition
costs:  Medicare payment allowances were about 75
percent greater than the discounted prices.

The reason that carriers' allowances are so much
greater than the prevailing market prices is that
carriers generally set them on the basis of
manufacturers' catalog prices.  These catalog
prices, however, are not representative of the
true market prices.

The HCFA has recently taken some action but more
needs to be done.  We recommend that the HCFA
direct the carrier to lower Medicare allowances
for CAPD supplies to the discounted prices paid
by dialysis clinics and suppliers.

Id. at 7-8.

This report recognized that many dialysis facilities and

clinics often had common ownership.  While it notes that this

permits circumvention of regulations that attempt to limit prices, it does not indicate that such circumvention was an actual violation of any regulation or statute nor does the report recommend that such common ownership be prohibited. Instead, the report notes that the markup on supplies may violate regulatory prohibitions on "grossly excessive" charges and recommends that such pricing be specifically regulated. While this report may have placed defendants on notice that the markups on discounted supplies was unlawful, as previously discussed, the claim based on markups has been dismissed on other grounds. Instead, relator must show that defendants had knowledge that the common ownership of CMM and AMS was an arrangement that resulted in regulatory violations. The evidence shows that Lewis received the OIG report from the Ross & Hardies attorneys and that the attorneys and Lewis separately reviewed the report.[12] One of the attorneys testified that the report did not indicate it was illegal for a dialysis facility and supplier to be commonly operated and therefore he did not conduct further research on that issue nor change his prior opinions regarding the legality of the relationship. Riley Dep. at 115 (Def. Exh. G). Lewis states in an affidavit that, after reviewing the attorneys' March 31, 1988 memorandum and the OIG report, he "continued to believe AMS's

---

[12]No evidence is presented that the attorneys discussed the report with Lewis, only that they provided it to Lewis.

operations were legal, but that Medicare intended to reduce the reimbursement rates payable to companies such as AMS." Def. Exh. P. At least as regards common ownership, the statements of Riley and Lewis are consistent with the OIG report and there is no other evidence contradicting Lewis's statement as to his actual knowledge at that time, nor any evidence from which it can be inferred that he was being deliberately ignorant or acting in reckless disregard of the truth.

Until January 1995, no statute or regulation was in effect that expressly prohibited common ownership of a dialysis facility and supplier. In response to a document request, HCFA stated:

> HCFA found no documents from January 1, 1983 to January 1, 1995, which relate to or reflect any directive or communication from the [OIG] or any other government agent directing or suggesting that the subject Medicare carriers should stop or withhold payment to a CAPD supply company under common ownership with a dialysis facility. Therefore, HCFA has no reason to believe that claims were denied during August 1, 1991 to January 1, 1995 on the basis cited above.

Def. Exh J at 2. Thus, not only were there no express provisions prohibiting the common ownership, there is also no evidence that any claims for reimbursement were ever denied on such a ground.

The Ross & Hardies attorneys sent Lewis a January 25, 1989 memorandum (Def. Corrected Exh. R) advising him that proposed regulations would reduce the reimbursement rate for

supplies.  The memorandum refers to the proposed regulations as resulting from the OIG report.  While the issue was not raised in the memorandum, it is still noteworthy that there is no legal advice in the memorandum that the common ownership is a problem.

In December 1991, the Ross & Hardies attorneys sent Lewis a memorandum (Def. Exh. K) advising him about new operational requirements for dialysis suppliers and upcoming changes in reimbursement rates.  The memorandum advises Lewis to consider whether Method I or Method II will be more profitable and to place patients into the more profitable program.  Dec. 3, 1991 Memo. at 9.  More to point on the ownership issue, the memorandum advises Lewis regarding proposed disclosure requirements as to the ownership of dialysis suppliers.  Id. at 5-6.  The memorandum notes the proposed requirements regarding reporting who has an ownership interest in the supplier and a requirement to report crimes or Medicare sanctions of any owner or "managing employee." It is noted that HCFA could refuse enrollment based on these disclosures.  No mention is made that common ownership with a dialysis facility could be a basis for denying enrollment.  When the proposed regulations went into effect, the application form required disclosure of other entities that billed Medicare and for which an owner or managing employee of the applicant was an owner or managing employee.  AMS's 1993 Medicare Supplier Number

Application discloses that Lewis was an owner of AMS and the President of CMM. Def. Exh. M.

In September 1993, the Ross & Hardies attorneys sent Lewis a Health Law Update that it had prepared. Def. Corrected Exh. N. The Update informed clients regarding the 1993 Stark Act that was to go into effect on January 1, 1995. Among other prohibited referrals, this statute would prohibit a physician from referring a patient for dialysis supplies to an entity with which the physician had a "financial relationship" and for which payment may be made by Medicare or Medicaid. The Update advised that Method II supply companies owned by physicians would be adversely affected by the amendments, but that restructuring of the companies might enable physicians or entities to fall within exceptions. The Update expressed optimism that a technical amendment might occur prior to the effective date that would except dialysis related services. The Update also advised that no action need be taken at the present time. The Update clearly implied that existing common ownership relationships of Ross & Hardies clients did not violate the pre-Stark Act statutes and regulations.

Because the Stark Act was not amended, AMS ceased operations prior to the January 1, 1995 effective date.

Relator points to evidence that defendants were never specifically advised that the common ownership relationship did

not violate § 1320a-7b(b). But even if it were to be assumed that the attorneys should have recognized the possibility of a violation of that statute, it cannot be assumed that Lewis should have recognized that possibility on his own and inquired further.

Relator also points to evidence regarding whether Lewis should have been aware that the markups on the discounts were unlawfully excessive. Relator also contends that Lewis failed to follow purported legal advice that the entities had to report the discounts.[13] As previously discussed, relator's claims are limited to being based on common ownership. Any claim based on there being excessive markups that are themselves unlawful has previously been dismissed. Therefore, it is unnecessary to consider whether defendants had knowledge of unlawful conduct regarding the markups.

The undisputed evidence establishes that Lewis sought the advice of attorneys in purchasing Rush's dialysis facility, incorporating AMS and CMM, and regarding the operations of AMS as a dialysis supplier. The attorneys, who also did the incorporation work for AMS and CMM, were fully aware of the ownership relationship between the two entities and that one

---

[13]Defendants deny that the markups were unlawful or that they should have known they were unlawful. They also dispute that there was any requirement to report the discount or that the attorneys advised them that the discounts had to be reported. No conclusion is reached regarding whether genuine factual disputes exist as to these issues.

functioned as a Method I dialysis facility and one as a Method II dialysis supplier. There is no indication that Lewis hid from the attorneys any pertinent facts regarding the ownership relationship. Lewis was continually advised that his operations were lawful and, when advised of changes in applicable statutes and regulations, Lewis accordingly revised his conduct. When finally advised that the ownership relationship would be unlawful under a new statute, AMS ceased operations before the new statute went into effect. The only reasonable inference that can be drawn from the undisputed evidence is that Lewis (and the entities he controlled) had no actual knowledge during the pertinent time period that the common ownership either prohibited Lewis from referring patients to AMS or that AMS failed to qualify as a dialysis supplier because of the common ownership. Neither can it be inferred that Lewis deliberately ignored or acted in reckless disregard of the truth. Therefore, it cannot be found that Lewis knowingly presented or knowingly caused to be presented any false Medicare claims and defendants are entitled to summary judgment on the remaining FCA claims.

Since defendants are entitled to summary judgment, relator's summary judgment motion necessarily must fail. Relator's summary judgment motion will be denied.

IT IS THEREFORE ORDERED that Anil Bidani's motion for summary judgment is denied. Defendants' motion for summary

judgment [91-1] is granted.  The Clerk of the Court is directed
to enter judgment in favor of defendants and against plaintiff
(a) dismissing with prejudice plaintiff's claims based on the
common ownership of American Medical Supply Company and Circle
Medical Management, Inc. and (b) dismissing all other aspects of
plaintiff's cause of action without prejudice for lack of subject
matter jurisdiction.

ENTER:

UNITED STATES DISTRICT JUDGE

DATED:   JANUARY   11   , 2001